H & H POULTRY CO., INC., Defendant Below, Appellant,

v.

George R. WHALEY, Plaintiff Below, Appellee.

Supreme Court of Delaware.

Submitted Sept. 18, 1979.

Decided Oct. 26, 1979.

James D. Griffin, of Griffin & Hackett, P. A., Georgetown, for defendant below, appellant, on appeal.

Myron T. Steele, of Prickett, Sanders, Jones, Elliott & Kristol, Dover, for plaintiff below, appellee.

Before DUFFY, McNEILLY and HORSEY, JJ.

McNEILLY, Justice:

H & H Poultry Co., Inc., (H & H) appeals from a Superior Court judgment finding it liable in contract to George R. Whaley (Whaley) in the amount of $48,916.01. H & H contends the Trial Judge erred in finding that a contract existed between the parties, in denying its motion to amend its answer to include the affirmative defense of the Statute of Frauds (6 *Del.C.* § 2–201), and in the assessment of damages.

I

Whaley is a Sussex County grain and poultry farmer of some thirty-five years. He has raised chickens, and later turkeys, for H & H over a period of twenty years under oral contract, with the exception of one year when his bank required a written contract as security for a loan. For six years prior to the growing year in question, Whaley had grown twenty-four thousand turkeys for H & H, each year under agreement with H & H to have approximately twelve thousand toms, weighing twenty-two to twenty-five pounds, and twelve thousand hens, weighing between sixteen and seventeen pounds, ready for processing by H & H for the annual Thanksgiving market. Whaley would pay for the poults, feed and labor, and would provide the necessary housing and equipment. In return, H & H would compensate Whaley on a per pound live weight basis on the date of pickup, at a price determined by a day to day variable market value in the turkey growing Shenandoah Valley area of Virginia and North Carolina. Routinely Whaley would call H & H in the spring to determine how may turkeys were wanted, and, without more details, he would then buy the poults and raise them as in years before. The same phone call was made during the growing year with which we are concerned, except initially Whaley's conversation was with the new controlling stockholder and chairman of the board of H & H, Winton Gouge, about the purchase of baby chicks, since Mr. Gouge was known by Whaley as the controlling supplier of the Hubard and Hubard breed of baby chicks in the East. Mr. Gouge informed Whaley that no chicks were available. According to Whaley the following conversation with Mr. Gouge next occurred:

Q  Any further conversations?

A  Yes. I said, "By the way, I have had a lot of inquiries from other turkey processors wanting me to put turkeys with them and you folks haven't changed your mind about dressing turkeys this fall; have you?" And he said, "I don't know. Let me talk with Howard."

Q  Who did you understand him to mean when he said, "Howard"?

A  Howard Pepper.

Q  What happened.

A  Well, he left the phone for four or five minutes and came back and said, "Yes, you can put in twenty-four thousand for us."

Q  Was there any conversation after that?

A None.*

In reliance upon that conversation Whaley testified that he purchased twenty four thousand poults, built forty new rain shelters at two thousand dollars each, purchased sixty feeders for approximately six thousand dollars and installed underground pipe which ordinarily he would not need. Whaley testified that in early November he called Mr. Gouge to remind him that it was time for someone from H & H to weigh a cross section of the turkeys to see what size they were. He claims to have been surprised that Mr. Gouge denied responsibility although his neighbor, Horace Pepper, had alerted him to that probability at a Halloween party.

The testimony of Howard Pepper, President of H & H after the Gouge takeover, verified by his son, William Pepper, is diametrically opposite to that of Whaley as to the spring conversation of Whaley with Mr. Gouge. According to the Peppers, H & H had completely changed its processing equipment and building so that turkeys could no longer be processed. Mr. Howard Pepper denies emphatically that Whaley was told he could put in turkeys for H & H that year. To the contrary, Mr. Pepper's testimony is that Whaley was told that if he put turkeys in, he was on his own.

At the conclusion of the testimony before the Court on the contractual issue the Court ruled as follows:

> "Gentlemen, I have determined that I could not get any better of a feeling for a close case, where I believe people may sincerely feel they are telling the story as it is, than I have now, and there is no need to deliberate on the matter. I am convinced that judgment must be and shall be entered in favor of the plaintiff in this case."

■ In an appeal from a judgment in a non-jury case, this Court generally accepts the Trial Court's findings of fact if they are sufficiently supported by the record and are the product of an orderly, logical, and deductive process. *Levitt v. Bouvier*, Del. Supr., 287 A.2d 671 (1972). Although the factual contentions are sharply in dispute we cannot say that the Court erred in its ruling. There are sufficient facts in the record to sustain the judgment, and no abuse of discretion or error of law appears. Therefore, we affirm the Trial Judge's finding that an enforceable contract existed.

II

■ Turning to the Statute of Frauds issue, we agree with the ruling of the Trial Court. Without the necessity of reaching other grounds we affirm the Court's ruling on the ground of untimeliness.

Three years after the Complaint was filed in this case H & H moved to amend its Answer to include the affirmative defense of the Statute of Frauds, and further moved for summary judgment based upon the statute. Both motions were denied. Whaley contends, and it is not denied, that H & H was aware of the availability of the defense, and no excusable reason is given now for the delay. In addition to the inexcusable neglect, we must consider the possible prejudice to Whaley arising from the impossibility of taking the deposition of Gouge, Chairman of the Board of H & H, whose testimony might have proved favorable to Whaley for one reason or another. Superior Court Civil Rule 15(a) states that ". . . leave (to amend) shall be freely given when justice so requires", but the allowance of any amendment to the pleadings (after the first one) is within the discretion of the Court. *Mergenthaler, Inc. v. Jefferson*, Del.Supr., 332 A.2d 396 (1975). We find no abuse of discretion in the Trial Judge's denial of H & H's motions to amend and for summary judgment.

III

On the issue of damages H & H contends the Trial Court erred in its determination of damages and in finding that Whaley complied with the law requiring mitigation of damages.

* Mr. Gouge died before he could be deposed on the merits of this litigation.

■ Following Whaley's conversation with Mr. Gouge in early November, during which Mr. Gouge informed Whaley conclusively that H & H did not intend to process the turkeys, Whaley called all companies whose names were furnished him by H & H as possible outlets, as well as the processors he knew in the Shenandoah Valley and elsewhere. Time was of the essence because if Whaley was unable to move the turkeys for the Thanksgiving market his next high market would be Christmas. By that time the turkeys would weigh more and be worth less per pound. His efforts and success clearly were sufficient to be regarded as within the mitigation of damage requirements.

On the 19th of November, Whaley negotiated a contract of sale with David Polin of Diamond State Poultry Co., Inc. for approximately eleven thousand toms and eleven thousand hens based upon the New York Urner Barry Market (fifty four cents per pound dressed weight) less eleven cents per pound for processing, also less the weight of those turkeys condemned as unmarketable.

■ According to Whaley's testimony the Valley price on November 10th, the day after his phone conversation with Mr. Gouge, obtained by him from Goldsboro Milling in North Carolina, was forty one cents per pound for toms and forty six cents per pound for hens. H & H objected to Whaley's testimony as hearsay and as a price given on an arbitrary date. We cannot accept either objection since H & H admits to using the Valley price throughout the years, and the date of the price obtained is the day after Whaley was informed by Mr. Gouge that H & H would not process his turkeys. H & H cannot rely upon Valley price on the one hand and deny it on the other. True, it has been established that there is no "Valley Price" as such, but Whaley did exactly what H & H must have done in years past, that is, call a mill, a processor, a grower, or someone else doing business in the Virginia-North Carolina area where turkeys are widely grown and marketed, to ask what the market is in that area on a given day. Absent an auction, exchange or other center offering written daily print outs, information obtained orally which appears to be the only available information, and because it appears to have been customarily relied upon by both parties, must be accepted, subject to attack for credibility and weight by cross-examination or the introduction of conflicting evidence. See 43 A.L.R. 1192.

■ We find no abuse of discretion nor error of law in the Trial Court's assessment of damages based upon the difference Whaley would have received under the oral contract with H & H the day after being informed of H & H's breech of contract, and the amounts received by him from Diamond State Poultry, plus loading costs normally borne by H & H.

AFFIRMED.