# IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| SUNDER ENERGY, LLC, | § | |
| | § | |
| Plaintiff Below, | § | No. 455, 2023 |
| Appellant, | § | |
| | § | Court Below: |
| v. | § | Court of Chancery of the |
| | § | State of Delaware |
| TYLER JACKSON, FREEDOM | § | |
| FOREVER, LLC, BRETT BOUCHY, | § | |
| CHAD TOWNER, FREEDOM SOLAR | § | C.A. No. 2023-0988 |
| PROS, LLC, and SOLAR PROS LLC, | § | |
| | § | |
| Defendants Below, | § | |
| Appellees. | § | |

Submitted: September 18, 2024
Decided: December 10, 2024

Before **SEITZ**, Chief Justice; **VALIHURA**, **TRAYNOR**, **LEGROW**, and **GRIFFITHS**, Justices, constituting the Court *en Banc*.

Upon appeal from the Court of Chancery and the Superior Court of the State of Delaware. **AFFIRMED in part, REVERSED in part.**

Raymond J. DiCamillo, Esquire, Chad M. Shandler, Esquire, Steven J. Fineman, Esquire, Kelly E. Farnan, Esquire, Kevin M. Gallagher, Esquire, Christine D. Haynes, Esquire, Alexander M. Krischik, Esquire, Sara M. Metzler, Esquire, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware, Joshua Berman, Esquire (*argued*), Jackson Herndon, Esquire, Paul C. Gross, Esquire, Ben Nicholson, Esquire, Michael H. Rover, Esquire, PAUL HASTINGS LLP, New York, New York, *for Appellant Sunder Energy, LLC.*

Timothy R. Dudderar, Esquire, Aaron R. Sims, Esquire, Eric J. Nascone, Esquire, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware, Maureen M. Stewart, Esquire (*argued*), FOLEY & LARDNER LLP, Tampa, Florida, Jordan C.

Bledsoe, Esquire, Tyler Dever, Esquire, Bryce W. Talbot, Esquire, FOLEY & LARDNER LLP, Salt Lake City, Utah, *for Appellee Tyler Jackson*.

Paul J. Lockwood, Esquire (*argued*), Jenness E. Parker, Esquire, Jessica R. Kunz, Esquire, Matthew R. Conrad, Esquire, Eric M. Holleran, Esquire, SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, Wilmington, Delaware, Karen Hoffman Lent, Esquire, Evan R. Kreiner, Esquire, SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, New York, New York, *for Appellees Freedom Forever LLC, Brett Bouchy, Chad Towner and Freedom Solar Pros, LLC.*

**LEGROW**, Justice:

This interlocutory appeal arose from the Court of Chancery's decision denying an employer's motion for a preliminary injunction that sought to enforce restrictive covenants against its former employee and minority member. The Court of Chancery refused to issue the requested injunction because it found that the restrictive covenants at issue were unenforceable for two independent reasons: first, because they were part of an agreement that "originate[d] in an egregious breach of fiduciary duty"; and second, because the covenants were "facially unreasonable."[1] In light of those conclusions and its factual findings, the court declined the employer's invitation to "blue pencil" the restrictive covenants to make them reasonable.

On appeal, the employer does not challenge the Court of Chancery's factual findings or its conclusion that the restrictive covenants were facially unreasonable. Instead, the employer argues that the court's refusal to blue pencil the covenants to bring them within a reasonable scope contravened "decades of Delaware law" and this State's commitment to freedom of contract.[2] We disagree. The court's decision was entirely consistent with the factual record, Delaware precedent, and settled principles of contract law. We also affirm the trial court's conclusion—challenged

[1] *Sunder Energy, LLC v. Jackson*, 305 A.3d 723, 732 (Del. Ch. 2023).

[2] Appellant's Opening Br. at 4.

on appeal—that Utah law governed the employer's tortious interference claim against its former employee's new employers.

We reverse the Court of Chancery's opinion in one narrow respect. During the proceedings, the employee argued that the employer could not demonstrate a reasonable probability of success on the merits of its claim because the restrictive covenants resulted from breaches of fiduciary duty and therefore were unenforceable. Although the trial court's factual findings supported its decision to deny the preliminary injunction on that basis, the court's opinion can be read as holding that the employer's operating agreement was unenforceable as a matter of law because of those fiduciary breaches. That holding exceeded the scope of the issues before the court at the preliminary injunction stage of the proceedings. Any such holding, to the extent it is necessary, must await a complete factual record and participation of all the indispensable parties. We therefore reverse the trial court's opinion only to the extent that it can be read as holding that the appellant's operating agreement was unenforceable as a matter of law.

## I. RELEVANT FACTUAL AND PROCEDURAL BACKGROUND[3]

### A. Sunder's Formation

Sunder Energy, LLC ("Sunder") is a solar sales dealer organized as a Delaware limited liability company, headquartered in Utah, and currently operating in at least forty-seven states.[4] Sunder's business model involves securing agreements to install solar power systems in residential homes using teams of door-to-door sales representatives.[5] Until September 2023, Sunder acted as an exclusive dealer for Freedom Forever, LLC ("Freedom"), a leading solar installation firm. Under the terms of Sunder and Freedom's arrangement, when a Sunder representative secured an agreement with a homeowner, the Sunder representative would enter the sale into Freedom's sales portal, and Freedom would then install the system, collect payment from the customer, and pay a commission to Sunder.[6] That commission was shared between Sunder and the representative who made the sale.[7]

Sunder was founded in August 2019 by Eric Nielsen, Max Britton, Tyler Jackson, Steven Cohen, Michael Gutschmidt, Jed Sewell, and Max Ganley (together,

---

[3] Unless otherwise noted, the recited facts are taken from the Court of Chancery's November 22, 2023 Opinion Denying a Preliminary Injunction. *See Sunder Energy, LLC v. Jackson*, 305 A.3d 723 (Del. Ch. 2023).

[4] *Sunder Energy*, 305 A.3d at 732.

[5] *Id.* at 733.

[6] *Id.*

[7] *Id.*

the "Co-Founders").[8] The Co-Founders formed Sunder after they left a different solar sales dealer called LGCY Power, LLC ("LGCY").[9] Nielsen served as LGCY's Chief Revenue Officer; Britton was the Vice President; and Jackson, Cohen, Gutschmidt, Sewell, and Ganley were Regional Sales Managers.[10]

LGCY commenced a lawsuit (unrelated to this case) against the Co-Founders on September 23, 2019.[11] The Co-Founders and Sunder engaged Snell & Wilmer to represent them jointly in that action.[12] In relevant part, LGCY argued that Britton had received grants of restricted stock units as a part of his compensation that were subject to a two-year non-compete covenant, and Britton violated that covenant when he left to form Sunder.[13] In response, Britton argued:

> TWO years is a LONG time not to compete in the very industry I have bet my family's future on. This is what I have been doing for close to a decade. This is my career. . . . This seems very heavy handed. A two year non compete is nuts.[14]

---

[8] *Id.*

[9] *Id.*

[10] The Court of Chancery noted that Nielsen's position as LGCY's Chief Revenue Officer effectively made him the head of sales, drawing a parallel to Appellee Tyler Jackson's role at Sunder. *Id.*

[11] *Id.*

[12] *Id.*

[13] *Id.* at 734.

[14] *Id.* (omission in original).

Notwithstanding the LGCY lawsuit, Sunder's business grew rapidly.[15] By December 2019, Sunder had generated hundreds of thousands of dollars in commissions.[16]

## B.    The 2019 LLC Agreement

When they formed Sunder in August 2019, the Co-Founders agreed on an equity split under which Jackson, Cohen, Gutschmidt, Sewell, and Ganley (the "Minority Members") would each receive 8% of the company's equity for a total stake of 40%, while Nielsen and Britton would own the remaining 60% of the equity.[17] Despite this, the Co-Founders thought of and referred to themselves as partners.[18] Although all the Co-Founders expected Nielsen and Britton to manage Sunder as majority owners, there were no discussions of separate types of equity or different rights and obligations between the Minority Members, Nielsen, and Britton.[19]

When the Co-Founders filed a certificate of formation with the Delaware Secretary of State on August 16, 2019, Sunder had not yet executed an operating agreement.[20] Rather, the newly founded company operated under the default

---

[15] *See id.*

[16] *Id.*

[17] *Id.* at 733.

[18] *Id.*

[19] *Id.*

[20] *Id.*

provisions of the Delaware Limited Liability Company Act (the "LLC Act"), subject to any specific unwritten understandings between the Co-Founders.[21]

In fall 2019, Nielsen and Britton engaged Snell & Wilmer[22] to draft an operating agreement (the "2019 LLC Agreement" or the "Agreement").[23] When the draft was complete, Nielsen and Britton met with Snell & Wilmer attorneys at the firm's office to review the Agreement's terms.[24] The other Co-Founders were not invited to this meeting, and the terms of the Agreement were never explained to them.[25] Nielsen testified that he could not have understood the 2019 LLC Agreement without the attorneys explaining it to him, and he invoked privilege in response to questions about the 2019 LLC Agreement on the grounds that his understanding came entirely from counsel.[26] Jackson and the other Minority Members were all high school graduates, had spent all or most of their careers in the door-to-door sales industry, and were not sophisticated in legal matters.[27]

---

[21] *Id.*

[22] At this point, Snell & Wilmer were also jointly representing Sunder and the Co-Founders in the LGCY suit. All the Co-Founders regarded the firm as their counsel. *Id.*

[23] *Id.* at 734.

[24] *Id.*

[25] *Id.*

[26] *Id.*

[27] *Id.* at 736.

Several aspects of the 2019 LLC Agreement differed from the default provisions of the LLC Act and the members' unwritten understanding that had governed the Co-Founders' relationship since Sunder's formation. For example, the Agreement expressly disavowed general fiduciary duties among the Co-Founders and created two classes of member units—Common Units for Nielsen and Britton and Incentive Units for the Minority Members.[28] These two classes of equity had drastically different rights.[29] Incentive Unit holders lacked voting, consent, pre-emptive, and informational rights, as well as broad indemnification and advancement rights, all of which were awarded only to Nielsen and Britton as the sole owners of Common Units.[30] Additionally, Incentive Unit holders were bound by a contractual confidentiality obligation, which did not apply to Common Unit holders.[31] In reality, Incentive Units were structured to be nothing more than a form of incentive compensation with numerous limitations.[32] The Agreement provided for automatic forfeiture of any unvested Incentive Units if any holder left Sunder, imposed transfer restrictions, and gave Sunder a call option to repurchase vested

---

[28] *Id.* at 734.

[29] *Id.* at 736.

[30] *Id.* at 734–35.

[31] *Id.* at 735.

[32] *Id.*

7

units for zero dollars if any holder was terminated for cause or left Sunder without "Good Reason."[33]

The Agreement's most significant component for purposes of this case was a set of broad restrictive covenants binding the Minority Members and their "affiliates" while they held Incentive Units and for a period of two years after they ceased owning equity in Sunder.[34] The Agreement imposed a Competition Restriction and Personnel Restriction (collectively, the "Covenants").[35] The Competition Restriction prohibited Incentive Unit holders and their "affiliates" from engaging in any door-to-door sales business in the markets where Sunder operated or reasonably anticipated operating.[36] The Personnel Restriction prohibited Incentive Unit holders and their affiliates from recruiting or "encourag[ing] to leave" any individual whom Sunder employed, received services from, or had a business relationship with.[37]

---

[33] *Id.*

[34] *Id.* at 729.

[35] The 2019 LLC Agreement further prohibited Incentive Unit holders from soliciting, selling to, accepting any business from, or engaging in any business relationship with any of Sunder's customers (the "Customer Restriction"); and prohibited Incentive Unit holders from inducing, influencing, causing, advising, or encouraging any Sunder stakeholder to terminate its relationship with Sunder (the "Stakeholder Restriction"). *Id.* These covenants are not at issue in this interlocutory appeal.

[36] *Id.* at 755.

[37] *Id.* at 758–59.

On December 31, 2019—New Year's Eve—Nielsen sent the Minority Members an email (the "New Year's Eve Email") that attached a .pdf of the 2019 LLC Agreement.[38]  Addressing the Minority Members as "Partners," he wrote:

> Max [Britton] and I have executed our portion of the Sunder Operating Agreement today and a copy for your review is attached. I will be sending each of you a couple of documents via docusign momentarily. The first one contains your grant of shares and the second one is a joinder agreement that will formally add each of you to the Operating Agreement. If you are married, your spouse will also be sent a spousal consent form. Please let Max or me know if you have any questions.
>
> Lastly, the attorney's [sic] highly recommend completing these documents by the end of tonight, but we don't expect any of you to sign something if you are uncomfortable with it or if you need more clarification from the attorney's [sic] on something.[39] Please let me know if you have any questions.
>
> Happy New Year![40]

Nielsen circulated the signature pages via DocuSign, which meant that the Minority Members did not have to scroll through the 2019 LLC Agreement to reach the end and sign it—they only had to look at a one-page joinder agreement.[41]

---

[38] *Id.* at 736.

[39] The 2019 LLC Agreement itself recited that each party had the opportunity to review the Agreement with independent legal counsel and that Snell & Wilmer only represented Sunder in connection with the document's preparation.  *Id.* at 735.

[40] *Id.* at 736.

[41] *Id.*

Appellee Tyler Jackson signed the Agreement barely an hour after receiving the New Year's Eve Email.[42]

That pattern continued when the partners amended Sunder's operating agreement in 2021 (the "2021 LLC Agreement"). No copy of the amended agreement was sent to the Minority Members; rather, Nielsen and Britton only circulated a signature page. Nielsen and Britton sent out an email stating that the 2019 LLC Agreement was being amended to add another member and that there were no substantive changes.[43] This representation, however, was not true. The 2021 LLC Agreement expanded the Covenants' geographic scope.[44]

Testimony given by Jackson and other Minority Members in the LGCY action in 2022 demonstrated that they believed that the 2019 and 2021 LLC Agreements granted them equity with the same rights as Nielsen and Britton.[45] While represented by a Snell & Wilmer attorney at his deposition in that action, Jackson testified to his understanding that the Agreement did not restrict his ability to compete with Sunder

---

[42] *Id.* at 737.

[43] *Id.*

[44] *Id.*

[45] *Id.*

or solicit its customers or employees.[46]  It does not appear from the record that Jackson's attorney ever advised him of this misimpression.[47]

## C.    The Sunder-Freedom Relationship

Upon Sunder's formation in August 2019, Sunder and Freedom entered into a five-year Dealer Agreement under which Sunder exclusively marketed and sold Freedom's solar installation services in certain regions.[48]  From 2019 to 2023, Sunder grew into one of Freedom's "super-dealers," generating over 25% of its sales.[49]  Freedom supported Sunder's business with marketing and administrative services, including payroll and commission calculations.[50]

Jackson's responsibilities at Sunder grew with the company as his sales group excelled.[51]  Jackson was given direct authority over many of Sunder's key markets.[52]  By 2022, Jackson held the title of Vice President, and nearly half of Sunder's sales force reported to him directly or indirectly.[53]  He became Sunder's highest-paid sales leader, earning $4.8 million in compensation over four years.[54]  Over the same

---

[46] *Id.*

[47] *Id.*

[48] *Id.* at 738.

[49] *Id.* at 737.

[50] *Id.*

[51] *Id.*

[52] *Id.*

[53] *Id.*

[54] *Id.*

period, he received $1.2 million in profit distributions from his Incentive Units.[55] Jackson's title of "Vice President," however, was simply that—a title—and did not actually grant him executive rights or responsibilities.[56] He remained an independent contractor with Sunder.[57]

In 2021 and 2022, Nielsen and Britton made a series of business decisions that negatively affected Sunder's relationship with Freedom and with Sunder's own sales force.[58] First, Nielsen and Britton rejected an equity swap with Freedom, hoping instead to secure a private equity investment.[59] In an effort to appear more attractive to private equity investors, Nielsen and Britton took steps to increase Sunder's profits.[60] One proposed strategy involved using a finance company outside of Freedom's network, but Freedom vetoed that proposal because it would have caused Freedom to violate its exclusivity agreements with its financing partners.[61] But Nielsen and Britton successfully deployed another strategy that involved Sunder inflating solar installation costs received from Freedom, which artificially raised the deal price and effectively took money from Sunder's sales force by lowering

---

[55] *Id.*

[56] *Id.*

[57] *Id.*

[58] *Id.* at 738.

[59] *Id.*

[60] *Id.*

[61] *Id.*

commissions.[62]  Finally, when asked whether Sunder would continue working with Freedom after the initial five-year Dealer Agreement ended in 2024, Nielsen and Britton responded that, although they prioritized working with Freedom, they would not rule out the possibility that Sunder would go in a different direction.[63]

## D.    Jackson Joins Solar Pros

By early 2023, the combination of the artificial price floor and uncertainty about whether Sunder would continue with Freedom caused Sunder's sales force, particularly its sales leadership, to begin questioning whether they should move to another Freedom dealer.[64]  Solar Pros LLC ("Solar Pros"), a rapidly growing dealer majority owned by Brett Bouchy (one of Freedom's principles), posed an attractive option to Sunder's sales force because it offered significantly better commissions.[65] In Spring 2023, sixty-three Sunder sales professionals moved to Solar Pros.[66]

Appellee Tyler Jackson was among the Sunder sales leaders exploring employment opportunities with Solar Pros.[67]  After meeting with Freedom's principals in May 2023, Jackson asked Sunder's CFO for copies of the agreements that he had signed with Sunder, at which point he learned that he was bound by the

---

[62] *Id.*

[63] *Id.*

[64] *Id.* at 738–39.

[65] *Id.* at 739.

[66] *Id.*

[67] *Id.*

restrictive covenants.[68]  Thereafter, on September 14, 2023, Freedom and Sunder's principals met at Freedom's headquarters in Las Vegas.[69]  During this meeting, Freedom attempted to negotiate a price to release Jackson from the restrictive covenants, facilitate a transfer of Jackson's "group" to Solar Pros, and obtain a global release of all previous claims that Sunder had made against Freedom.[70]  The parties did not come to an agreement at that meeting, but they did not seem particularly far apart either.[71]

After learning that the meeting went well, Jackson circulated a list of Sunder sales representatives to three of his direct reports to identify who would join him at Solar Pros.[72]  Jackson's direct reports and their teams began to join Solar Pros within days of the Las Vegas meeting, and Jackson continued to recruit more members of his team to make the transition.[73]

Over a nine-day period in September 2023, nine of the twelve Senior Regional Managers, Regional Managers, and Co-Regional Managers who reported to Jackson

---

[68] *Id.*

[69] *Id.* at 741.

[70] *Id.*

[71] *Id.*

[72] *Id.* at 742.

[73] *Id.*

14

joined Solar Pros.[74]  Over three hundred Sunder sales personnel followed them.[75] None of the managers or sales personnel had any restrictions on their ability to work for a competitor or solicit Sunder personnel.[76]

Ultimately, Sunder and Freedom did not reach a deal.[77]  Nevertheless, on September 22, 2023, Jackson signed an independent consulting agreement with Freedom Solar Pros LLC ("Freedom Solar Pros), an affiliate of Freedom and Solar Pros, and resigned from Sunder four hours later.[78]  In this consulting agreement, Freedom Solar Pros agreed to indemnify Jackson and hold him harmless against claims brought by Sunder, including claims for any violations of the Covenants.[79]

On September 25, 2023, Solar Pros announced Jackson as its new President.[80] Jackson continued to recruit Sunder sales representatives to Solar Pros following his resignation from Sunder and before Sunder filed this action.[81]

---

[74] *Id.* at 729.

[75] *Id.*

[76] *Id.*

[77] *Id.* at 742.

[78] *Id.* at 743.

[79] *Id.*

[80] *Id.* at 729, 743.

[81] *Id.* at 743.

### E. Procedural History

Within a week of Jackson's announcement as Solar Pro's President, Sunder filed this action against Jackson for breach of contract and against Freedom, Freedom's principals, Freedom Solar Pros, and Solar Pros (together, the "Freedom Defendants") for tortiously interfering with Sunder's rights under the operating agreement.[82] Based on Sunder's allegations that Jackson was continuing to recruit Sunder personnel to Solar Pros, the Court of Chancery issued an *ex parte* temporary restraining order that enjoined Jackson from working with any of Sunder's business competitors or recruiting any Sunder employee to leave the company.[83] According to the Court of Chancery, that order was intended to preserve the status quo pending a hearing on whether to renew or lift the order.[84] The parties briefed whether the court should renew the temporary restraining order or allow it to expire, and the defendants also moved to dismiss the case in favor of arbitration.[85] The Court of Chancery renewed the temporary restraining order and denied the motion to dismiss.[86]

---

[82] App. to Appellee's Answering Br. at B3, B33.

[83] App. to Appellant's Opening Br. at A493–95.

[84] *Id.* at A495.

[85] *See id.* at A80–84.

[86] *Id.* at A496–98; *see id.* at A78.

16

Following expedited discovery, briefing, and a hearing, however, the court denied Sunder's motion for a preliminary injunction (the "Opinion").[87] In the Opinion, the Court of Chancery found that Sunder had not met the first element of the preliminary injunction standard, and because there was not a reasonable probability of Sunder succeeding on the merits of its claims, there was no reason for the court to balance the equities or consider irreparable harm.[88] The Court of Chancery found that (i) Sunder could not enforce the Covenants because they were invalid under the Delaware Limited Liability Company Act (the "LLC Act") and the common law governing fiduciary duties;[89] (ii) alternatively, Sunder could not enforce the Covenants because they were unreasonably broad as a matter of law;[90] and (iii) Sunder could not prevail against the Freedom Defendants for tortious interference because Utah law governed that claim and the Freedom Defendants had not engaged in tortious interference as defined by Utah law.[91] Sunder asked the Court of Chancery to certify an interlocutory appeal under Supreme Court Rule 42,

---

[87] *See Sunder Energy, LLC v. Jackson*, 305 A.3d 723 (Del. Ch. 2023).

[88] *Id.* at 745.

[89] *Id.* at 748.

[90] *Id.* at 752–53.

[91] *Id.* at 760.

and the Court of Chancery granted that application on December 22, 2023.[92] This

Court accepted the interlocutory appeal on January 25, 2024.[93]

## II.    STANDARD OF REVIEW

We review the Court of Chancery's exercise of its equitable powers,[94] its

decision to permit parties to amend pleadings or to consider an affirmative defense,[95]

and the grant or denial of a preliminary injunction for abuse of discretion.[96]  We

review questions of law, including the Court of Chancery's "formulation and

application of legal principles,"[97] and "the trial court's decision on the choice of law

to apply to tort claims, including issues of liability, damages, and remedies," *de

novo*.[98]  The parties disagree as to the standard of review with respect to the court's

---

[92] App. to Appellant's Opening Br. at A2448.

[93] Order Accepting Interlocutory Appeal at 1, 7.  Dkt. 7.  Jackson argued that some of Appellant's arguments on appeal exceeded the scope of the issues that we accepted for interlocutory consideration. Jackson's Reply Br. at 36.  Our Order Accepting Interlocutory Appeal, however, was not limited to any particular issues, and the parties had a full opportunity to brief and argue the issues raised on appeal.  As such, we have considered the merits of all Appellant's arguments.

[94] *In re Peierls Charitable Lead Unitrust*, 77 A.3d 232, 235 (Del. 2013); *Reserves Dev. LLC v. Severn Sav. Bank, FSB*, 961 A.2d 521, 523 (Del. 2008); *In re Unfunded Ins. Trust Agreement of Capaldi*, 870 A.2d 493, 497 (Del. 2005).

[95] *See Realty Enterprises, LLC v. Patterson-Woods*, 11 A.3d 228, 2010 WL 5093906, at *4 (Del. 2010) (TABLE); *Abdi v. NVR, Inc.*, 945 A.2d 1167, 2008 WL 78564, at *2 (Del. 2008) (TABLE); *H & H Poultry Co. v. Whaley*, 408 A.2d 289, 291 (Del. 1979).

[96] *Lawson v. Meconi*, 897 A.2d 740, 743 (Del. 2006); *SI Mgmt. L.P. v. Wininger*, 707 A.2d 37, 40 (Del. 1998); *Kaiser Aluminum Corp. v. Matheson*, 681 A.2d 392, 394 (Del. 1996).

[97] *Reddy v. MBKS Co.*, 945 A.2d 1080, 1085 (Del. 2008); *Lawson*, 897 A.2d at 743; *SI Mgmt.*, 707 A.2d at 40 (citing *Kaiser*, 681 A.2d at 394); *see also Unitrin, Inc. v. American Gen. Corp.*, 651 A.2d 1361, 1385 (Del. 1995) (citing *Merrill v. Crothall–American, Inc.*, 606 A.2d 96, 99 (Del. 1992)).

[98] *Bell Helicopter Textron, Inc. v. Arteaga*, 113 A.3d 1045, 1052 (Del. 2015) (footnotes omitted).

decision on blue penciling. We address that standard of review in detail in the section analyzing that argument.

### III. ANALYSIS

Appellant raises three arguments on appeal. First, Appellant contends that the Court of Chancery erred in declining to blue pencil the Covenants given the flagrant nature of Jackson's competitive conduct, which would have breached even a much narrower set of covenants.[99] Second, Appellant argues that the Court of Chancery erred in considering Jackson's fiduciary duty defense and in ruling at the preliminary injunction stage that Nielsen and Britton's breaches of fiduciary duty made the LLC Agreements unenforceable as a matter of law.[100] And finally, Appellant maintains that the Court of Chancery erred in ruling that Utah law governs Sunder's tortious interference claims against the Freedom Defendants, which effectively dismissed those claims because Sunder cannot meet the elements of that cause of action under Utah law.[101]

Appellees respond that the Court of Chancery appropriately exercised its discretion by refusing to blue pencil the covenants; Jackson timely raised his fiduciary duty defense and the record supported the court's ruling on that issue; and

---

[99] Appellant's Opening Br. at 21.

[100] *Id.* at 28.

[101] *Id.* at 40.

19

the Court of Chancery correctly determined that Utah law applies to Sunder's tortious interference claims.[102] We address each issue in turn.

## A. The Court of Chancery did not abuse its discretion by refusing to blue pencil the restrictive covenants.

The parties have suggested different standards of review that this Court should apply in its review of the Court of Chancery's decision to refuse Appellant's request to blue pencil the restrictive covenants. Appellant acknowledges that we usually review decisions granting or denying a preliminary injunction for abuse of discretion, but argues that the availability of blue penciling involves legal conclusions and public-policy considerations that typically are reviewed *de novo*.[103] Appellees contend that "[w]hether to blue pencil overbroad restrictive covenants is a matter within the trial court's discretion. . . . This court reviews a trial court's discretionary ruling under an abuse of discretion scope of review."[104]

Appellees have the stronger position under our precedent. In *C&J Energy Services*, this Court emphasized that blue penciling a merger agreement to excise a

---

[102] Appellee Tyler Jackson's Answering Br. at 3–4 (hereinafter "Jackson's Answering Br. at __."); Appellees Freedom Forever LLC, Brett Bouchy, Chad Towner and Freedom Solar Pros, LLC's Answering Br. at 3–4 (hereinafter "Freedom Defendants' Answering Br. at __.").

[103] Appellant's Opening Br. at 21 (citing *SI Mgmt.*, 707 A.2d at 40; *Kaiser*, 681 A.2d at 394; *Lawson*, 897 A.2d at 743; *Cantor Fitzgerald, L.P. v. Ainslie*, 312 A.3d 674, 685 (Del. 2024)).

[104] Jackson's Answering Br. at 41 (citing *Kodiak Bldg. Partners v. Adams*, 2022 WL 5240507, at *4 n.49 (Del. Ch. Oct. 6, 2022); *Firestone Tire & Rubber v. Adams*, 541 A.2d 567, 570 (Del. 1988)).

prohibition against soliciting other bids was not an appropriate exercise of equitable

authority in a preliminary injunction order, reasoning:

> Even after a trial, a judicial decision holding a party to its contractual obligations while stripping it of bargained-for benefits should only be undertaken on the basis that the party ordered to perform was fairly required to do so, because it had, for example, aided and abetted a breach of fiduciary duty.[105]

This Court reversed the Court of Chancery's decision because it did not make the

necessary findings to justify such an injunction.[106]

Our opinion in *C&J Energy Services* did not discuss the standard of review

for blue penciling restrictive covenants in the employment context specifically, but

it described judicial blue penciling as an "exercise of equitable authority" in the

context of an injunctive order.[107]  And although public-policy considerations may

buttress a court's discretionary decision to exercise its blue-penciling power, the

question presented in this appeal does not require us to consider public policy.

Rather, we are asked to decide whether the Court of Chancery erred in declining to

exercise its equitable authority based on the record before it.  Furthermore, Appellant

fails to identify any questions of law.  Therefore, as a threshold matter, this Court

---

[105] *C & J Energy Servs., Inc. v. City of Miami Gen. Employees'*, 107 A.3d 1049, 1072 (Del. 2014).

[106] *Id.* ("To blue-pencil an agreement to excise a provision beneficial to a third party . . . on the basis of a provisional record and then declare that the third party could not regard the excision as a basis for relieving it of its own contractual duties involves an exercise of judicial power inconsistent with the standards that govern the award of mandatory injunctions under Delaware law.").

[107] *Id.*

21

will review for abuse of discretion the Court of Chancery's decision to deny Appellant's request for blue penciling.

Delaware courts review non-compete and non-solicit agreements "subject to Delaware law to ensure that they are that they are (i) reasonable in geographic scope and temporal duration, (ii) advance legitimate economic interests of the party seeking enforcement, and (iii) survive a balancing of the equities."[108] After considering the Covenants' language and the record, the Court of Chancery concluded that the Competition Restriction and the Personnel Restriction, individually and together, were unreasonable and overbroad as to whom they covered, when they applied, and where they operated geographically.[109] The court found that the Competition Restriction, in particular, was "both oppressive and far more restrictive than any legitimate interest that Sunder could have."[110] Appellant has not appealed the Court of Chancery's conclusion that the Covenants are unreasonably broad as a matter of law, but instead challenges the court's decision to forgo blue penciling under the facts as the court found them.[111]

---

[108] *Ainslie*, 312 A.3d at 684 n.65 (citing *FP UC Holdings, LLC v. Hamilton*, 2020 WL 1492783, at *6 (Del. Ch. Mar. 27, 2020)).

[109] *Sunder Energy*, 305 A.3d at 759.

[110] *Id.* at 758.

[111] Appellant's Opening Br. at 22; Appellant's Reply Br. at 4–5.

But Appellant's decision not to challenge the trial court's factual findings or its conclusions about the Covenants' manifest overbreadth leaves Appellant with a difficult climb to reversal. Neither side disputes that Delaware courts have the discretionary power to blue pencil overbroad restrictive covenants to align a company's legitimate interests and an individual's right to be free from unreasonable restrictions on their livelihood. On several occasions, the Court of Chancery has utilized blue penciling to narrow the geographic scope and temporal duration of restrictive covenants to make them reasonable and enforceable.[112] Delaware courts have exercised their discretion to blue pencil restrictive covenants under circumstances that indicate an equality of bargaining power between the parties, such as where the language of the covenants was specifically negotiated, valuable consideration was exchanged for the restriction, or in the context of the sale of a business.[113]

---

[112] *See, e.g.*, *Del. Exp. Shuttle, Inc. v. Older*, 2002 WL 31458243, at *11–14 (Del. Ch. Oct. 23, 2002) (adding geographical limit to restrictive covenant that lacked one and revising temporal restriction in covenant); *RHIS, Inc. v. Boyce*, 2001 WL 1192203, at *1 (Del. Ch. Sept. 26, 2001) (concluding two-year restriction was unreasonable in the particular field but issuing injunction precluding solicitation for a period of one year from termination); *Norton Petroleum Corp. v. Cameron*, 1998 WL 118198, at *3 (Del. Ch. Mar. 5, 1998) (blue penciling geographic scope from 100-mile radius to 20-mile radius); *Knowles-Zeswitz Music, Inc. v. Cara*, 260 A.2d 171, 175 (Del. Ch. 1969) (blue penciling overbroad geographic scope in restrictive covenants to make the covenants reasonable to enforce).

[113] *See Del. Exp. Shuttle*, 2002 WL 31458243, at *11 n.53 (blue penciling covenants where the employee received three months' severance as consideration and the parties negotiated the precise language of the restrictions); *DGWL Investment Corp. v. Giannini*, C.A. No. 8647-VCP, at 20, 28 (Del. Ch. Sept. 19, 2013) (TRANSCRIPT) (blue penciling covenants imposed in connection with

This case did not carry any of those hallmarks, and the Court of Chancery therefore declined to blue pencil the agreement. In doing so, the court at times employed sweeping language regarding the policy implications of blue penciling. The court expressed the view that "[t]he differences in bargaining power between repeat-player businesses and individuals suggests that 'when a restrictive covenant is unreasonable, the court should strike the provision in its entirety.'"[114] The court reasoned that "the law should not create a 'no-lose' scenario in which employers receive the benefits of an overbroad covenant and, on those occasions when enforceability is challenged, gain the benefit of a lawful restriction through blue-penciling."[115] The Court of Chancery acknowledged the precedents on which Sunder relied to urge the court to rewrite the agreements but concluded that the court's equitable powers allowed it to hold an employer to the consequences of crafting a wholly unreasonable and overbroad covenant.[116]

Appellant contends that the court's reasoning was flawed for three reasons: (1) blue penciling overbroad restrictive covenants to bring them into reasonable line was historically "commonplace" under Delaware law; (2) the "egregious" facts of

---

a change-of-control transaction through which the company's sole founder and longtime CEO received $10 million).

[114] *Sunder Energy*, 305 A.3d at 753 (quoting *Del. Elevator, Inc. v. Williams*, 2011 WL 1005181, at *10 (Del. Ch. Mar. 16, 2011)).

[115] *Id.* at 754 n.68 (noting the same proposition above the line).

[116] *Id.* at 754 (citing *FP UC Holdings*, 2020 WL 1492783, at *8).

this case warrant blue penciling; and (3) the Court of Chancery should have deferred to the "blue penciling" provision in the 2019 LLC Agreement.[117] Appellees respond that the decision to blue pencil is a matter of discretion and should be exercised only where the equities require, which they do not in this case.[118] Appellees also contend that the "blue penciling" provision in the 2019 LLC Agreement is permissive and non-binding on the Court.[119]

We are compelled to begin our analysis by level-setting the issue before us. The parties have approached this appeal to some extent as though it is a referendum on the future of blue penciling in Delaware. They have invited us to craft a bright-line rule on when—if at all—it is appropriate for the Court of Chancery to blue pencil a restrictive covenant that the court concludes is unreasonable or overbroad. We do not view this case as the appropriate vehicle to create such a rule.

We acknowledge that restrictive covenant cases are time-consuming and expensive for the parties to litigate and that they impose substantially on judicial resources. We also appreciate the Court of Chancery's concern that businesses seeking to enforce restrictive covenants are increasingly selecting Delaware as a forum while other jurisdictions rebuff these types of actions. The Court of Chancery

---

[117] Appellant's Opening Br. at 22, 24, 26.

[118] Freedom Defendants' Answering Br. at 23–24, 31.

[119] *Id.* at 34.

25

is rightly concerned about this use of judicial resources and the principles of comity raised when a Delaware court is asked to blue pencil unambiguous contract provisions crafted between parties with no ongoing dealings in Delaware. And we have recognized the restraints on trade that are imposed by restrictive covenants that prevent employees from engaging in their chosen livelihood, which can lead to personal hardship and financial risk.[120] As we recently explained in *Cantor Fitzgerald, L.P. v. Ainslie*, these concerns "give rise to the strong policy interest that justifies the review of unambiguous contract provisions for reasonableness and a balancing of the equities, two exercises typically foreign to judicial review in contract actions."[121]

Given those concerns, there is an understandable temptation to seek bright-line rules of general applicability. But, on the other hand, Delaware is a contractarian state that holds parties' freedom of contract in high regard.[122] Balancing those contractarian principles against the restraints on trade that restrictive covenants impose requires a nuanced approach that does not lend itself well to judicial standard making. Some states have addressed this question by statute.[123] At this time,

---

[120] *See Ainslie*, 312 A.3d at 691.

[121] *See id.*

[122] *Id.* at 676.

[123] As the Court of Chancery noted, blue penciling is statutorily required under Texas law. *See Sunder Energy*, 305 A.3d at 747–48 (quoting Tex. Bus. & Com. Code § 15.51(c) ("[T]he court

26

Delaware has not chosen this path. We are hesitant to establish policy-based rules that have not been considered by the General Assembly.

As previously mentioned, there are a number of cases in which Delaware courts have blue penciled restrictive covenants to narrow a provision's geographic or temporal scope to salvage an overbroad restriction while not placing an unreasonable restraint on trade.[124] As the Court of Chancery recently explained in *Labyrinth, Inc. v. Urich*—delivered while this appeal was pending—"[w]here the restricted party holds the cards, Delaware has applied the 'rule of partial enforcement,' 'restricting [the overbroad covenant] to its proper sphere and enforcing it only to that extent.'"[125]

---

shall reform the covenant to the extent necessary to cause the limitations contained in the covenant as to time, geographical area, and scope of activity to be restrained to be reasonable . . . .")). Other states have statutes expressly prohibiting or limiting the practice of blue-penciling. *See, e.g.*, Wis. Stat. § 103.465 ("Any covenant . . . imposing an unreasonable restraint is illegal, void and unenforceable even as to any part of the covenant or performance that would be a reasonable restraint."); Ga. Code Ann. § 13-8-53(d) ("Any restrictive covenant not in compliance with the provisions of this article is unlawful and is void and unenforceable; provided, however, that a court may modify a covenant . . . so long as the modification does not render the covenant more restrictive with regard to the employee . . . .").

[124] *See, e.g.*, *Del. Exp. Shuttle*, 2002 WL 31458243, at *11–14; *RHIS*, 2001 WL 1192203, at *1; *Norton*, 1998 WL 118198, at *3; *Knowles-Zeswitz Music*, 260 A.2d at 175.

[125] *Labyrinth, Inc. v. Urich*, 2024 WL 295996, at *24 (Del. Ch. Jan. 26, 2024) (citing and quoting *John Roane, Inc. v. Tweed*, 33 Del. Ch. 4, 18 (Del. 1952) (finding that defendant was not of inferior bargaining power, that defendant was offered choices and chose the type of restrictive covenant at issue, accepting its benefits but later seeking to repudiate its burdens, and holding that the rule of partial enforcement for an overbroad restrictive covenant should apply); Leo E. Strine, *Categorical Confusion: Deal Protection Measures In Stock-For-Stock Merger Agreements*, 56 Bus. Law. 919, 941 n.71 (2001) ("[T]o the extent possible the court should not strip a merger partner of all of its contractual deal protections because those protections are unenforceable to their fullest written extent. Instead, the court should endeavor to pare away only the forbidden excess, leaving the

On the other hand, Delaware courts have declined to blue pencil when the circumstances and equities do not support that relief. In *Intertek Testing Services NA, Inc. v. Eastman*, the court refused to blue pencil a non-compete clause in a sale-of-business agreement after finding that doing so would inequitably rescue a sophisticated party from its own unenforceable contract.[126] Similarly, in *Kodiak Building Partners, LLC v. Adams*, the Court of Chancery declined to blue pencil overbroad restrictive covenants despite the presence of a judicial reformation clause within the agreement, reasoning that "[t]he inequities inherent in blue-penciling a noncompete also counsel against enforcing only those portions."[127]

Given the factual record in this case—which is undisputed on appeal—the Court of Chancery was well within its discretion to apply that precedent and refuse to blue pencil the Covenants. First, it was clear from the record that Jackson was not involved in any negotiations or discussions concerning the Covenants or their

merger partner with the benefits of those protections that fall within recognized standards of acceptability.").

[126] *Intertek Testing Servs. NA, Inc. v. Eastman*, 2023 WL 2544236, at *5 (Del. Ch. Mar. 16, 2023) ("In my view, revising the non-compete to save Intertek—a sophisticated party—from its overreach would be inequitable."); *Del. Elevator*, 2011 WL 1005181, at *10 ("[A] court should not save a facially invalid provision by rewriting it and enforcing only what the court deems reasonable."). *But see Labyrinth*, 2024 WL 295996, at *24–25 (refusing to dismiss enforcement of an overbroad restrictive covenant and finding that blue penciling may be appropriate). The court in *Labyrinth* noted that the plaintiff there "adequately pled facts indicating the context of the[] restrictive covenants may conceivably present a rare instance where equity and public policy might require blue penciling." *Id.* at *25.

[127] *Kodiak Bldg. Partners*, 2022 WL 5240507, at *4 n.49, *13 n.108 (citations omitted).

28

scope.[128]  He was not present for (or even invited to) the 2019 meeting at Snell & Wilmer's offices during which the firm's attorneys explained the Agreement's terms to Nielsen and Britton, and the terms were not explained to Jackson thereafter. Nielsen testified that he could not have understood the 2019 LLC Agreement without the attorneys explaining it to him, and he went so far as to invoke privilege in response to questions about the Agreement on the grounds that his understanding came entirely from counsel.[129]  Those facts allowed the Court of Chancery to conclude that the parties did not negotiate the Covenants in any substantive way.

Second, the circumstances surrounding Jackson's signing of the 2019 LLC Agreement also reveal important information about the parties' relative bargaining power.  On New Year's Eve, in an email that addressed the recipients as "Partners," Nielsen and Britton sent a .pdf of the 2019 LLC Agreement along with a separate DocuSign signature page, stating that "the attorney's [sic] highly recommend" that the Minority Members sign before midnight.[130]  Nielsen and Britton did not inform any of the Minority Members of the changes to their rights under the agreement, and the separate signature page meant that the Minority Members did not even have to

[128] App. to Appellant's Opening Br. at A1080–81 (Tyler Jackson Dep. at 336:13–338:12).

[129] *Sunder Energy*, 305 A.3d at 734.

[130] App. to Appellant's Opening Br. at A98.  It was not made clear to Jackson that Snell & Wilmer were not representing his interests in the creation of the 2019 LLC Agreement, even though they were simultaneously representing him in the LGCY suit.

open the Agreement in order to sign it. As instructed, Jackson signed the Agreement barely an hour after receiving the New Year's Eve Email—he never negotiated its terms. Similarly, in 2021, Nielsen and Britton obtained consent to the updated LLC Agreement by circulating only a signature page to the Minority Members. In fact, the record suggests that Jackson did not learn of the Covenants' terms until 2023 in a discussion with Solar Pros.

Additionally, Jackson received minimal-to-no separate compensation in exchange for his agreement to be bound by the Covenants. Rather, he was given "Incentive Units" under the Agreement that could not be freely transferred and were later repurchased by Sunder for $0.[131] In that respect, this case resembles *FP UC Holdings, LLC v. Hamilton*, in which the Court of Chancery found the company had imposed "draconian non-competes on company employees in exchange for minimal consideration" in the form of LLC membership units to which the company declined to assign value.[132] Although the decision in *FP UC Holdings* did not address the issue of blue penciling, the court concluded that it had "serious doubts that the Court would be inclined to rewrite the clause to make it more reasonable as a matter of equity."[133]

---

[131] Freedom Defendants' Answering Br. at 32.

[132] *FP UC Holdings*, 2020 WL 1492783, at *11 n.88.

[133] *Id*. at *8.

Finally, the terms of the Covenants are exceptionally broad, and no apparent effort was made to tailor the provisions to Sunder's legitimate interests. The Competition Restriction would prevent Jackson and his "affiliates" from being employed in any sales job in at least forty-six states without regard to whether the employer competed with Sunder or sold similar products. As the Court of Chancery noted, these restrictions not only applied to Jackson but "the Competition Restriction requires that Jackson prevent his Affiliates from engaging in any sales of products to consumers in their homes. As written, Jackson's daughter cannot go door to door selling Girl Scout cookies."[134] Moreover, the Covenants' duration is potentially indefinite, lasting for a period of two years after a person ceases to own Incentive Units. Because Sunder's call option allowed it to choose when (and if) to purchase vested Incentive Units and the holder could not freely transfer the units, this two-year period would only begin when Nielsen and Britton decided to trigger it. Until then, Jackson remained bound by the Covenants.[135]

Combined with the Agreement's customer restriction, the Competition Restriction prevents Jackson from participating in any business that sells to any

---

[134] *Sunder Energy*, 305 A.3d at 756.

[135] As the Court of Chancery acknowledged, Jackson would be entitled to incentive compensation while he held the units. But that compensation depended on Sunder's profits, which could be diverted or distributed in various ways to minimize Jackson's take. *Id.* at 756–57. Additionally, since the Covenants restrict both Jackson and his affiliates, including his family members, the risk of financial hardship remained real, and it is possible that Nielsen and Britton would elect to hold Jackson to the Covenants for an extended period by not repurchasing his vested units.

31

homeowner in the states where Sunder did business before his departure. The Personnel Restriction is similarly overbroad, preventing Jackson and his "affiliates" from directly or indirectly communicating regarding employment with any person who has ever been employed by Sunder for any period of time.

Despite this record, Appellant argues that the Court of Chancery should have blue penciled the Covenants because—in effect—Jackson's actions were so blatantly competitive that they would have constituted a breach of even the most narrowly circumscribed restrictive covenant. This argument, however, turns the analysis on its head and creates perverse incentives for employers drafting restrictive covenants. If employers know that even the most unreasonable covenants will be enforced if an employee's conduct is sufficiently flagrant, employers will be less incentivized to craft reasonable restrictions from the outset. Whether a court should blue pencil a covenant cannot turn on the egregiousness of the employee's conduct. Rather, the court's decision to exercise that equitable power should be based on the covenants themselves and the circumstances surrounding their adoption, as the Court of Chancery did here.

This is not to say that Delaware courts should never blue pencil an agreement that is overbroad in some respects. But the relief Appellant sought was a wholesale reformation of the parties' agreement. It would require the court to craft an entirely new covenant to which neither side agreed. That is, the Court of Chancery could not

simply constrain the Covenants' temporal or geographic scope. The court also would have had to rewrite the persons to whom the Covenants applied and the type of conduct they restricted, which would extend well beyond what Delaware precedent has historically allowed. That is the opposite of the freedom of contract principles that are esteemed by Delaware's legal system and that Appellant has urged us to uphold. The Court of Chancery's decision to refuse to employ this discretionary power therefore fell well within the bounds of reason.

**B.** **The Court of Chancery did not err in considering Jackson's defense to the Covenants' enforceability, but its legal conclusion exceeded the scope of the issues before the court.**

We review the Court of Chancery's decision to grant or deny a preliminary injunction for abuse of discretion.[136] We review questions of law, including the Court of Chancery's "formulation and application of legal principles,"[137] and whether the court "correctly formulated the legal standard for determining if [Nielsen or Britton] owed a fiduciary duty to [Jackson],"[138] *de novo*.[139]

Before holding that the Covenants were facially overbroad, the Court of Chancery first found that Sunder could not obtain a preliminary injunction because

---

[136] *Lawson*, 897 A.2d at 743; *SI Mgmt.*, 707 A.2d at 40; *Kaiser*, 681 A.2d at 394.

[137] *Reddy*, 945 A.2d at 1085; *Lawson*, 897 A.2d at 743; *SI Mgmt.*, 707 A.2d at 40 (citing *Kaiser*, 681 A.2d at 394); *see also Unitrin*, 651 A.2d at 1385 (citing *Merrill*, 606 A.2d at 99).

[138] *In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27, 48 (Del. 2006).

[139] *Bell Helicopter*, 113 A.3d at 1052.

the Covenants were the unenforceable product of Nielsen and Britton's breach of fiduciary duty.[140]  In particular, the court held that "[t]he record establishes that Nielsen and Britton breached their fiduciary duty of disclosure when seeking member approval for the 2019 LLC Agreement and the 2021 LLC Agreement."[141] The court therefore concluded that the terms of those agreements were "never validly approved."[142]  The court went on to hold that:

> Even at this preliminary stage, it is clear *as a matter of law* that Nielsen and Britton breached their fiduciary duty of disclosure in connection with the 2019 LLC Agreement and 2021 LLC Agreement. Nielsen and Britton therefore cannot enforce the terms of the 2021 LLC Agreement against Jackson.[143]

Although the Court of Chancery stated that this conclusion did not foreclose all possibilities of Sunder's success at trial, it held that "Sunder cannot enforce the Covenants as a matter of law . . . [or] rely on those provisions to secure a remedy from Jackson."[144]

Appellant's appeal from this holding presents a two-pronged question: first, did the Court of Chancery abuse its discretion in considering Jackson's fiduciary

---

[140] *Sunder Energy*, 305 A.3d at 748.

[141] *Id.*

[142] *Id.*

[143] *Id.* at 751 (emphasis added).

[144] *Id.* at 762.

duty defense; and second, did the Court of Chancery err by ruling as a matter of law on the merits of the fiduciary duty defense.

### 1. The Court of Chancery did not abuse its discretion by considering the fiduciary duty defense.

Appellant first argues that the Court of Chancery erred in considering Jackson's fiduciary duty defense.[145] This argument is a procedural one: Appellant contends that Jackson did not properly plead or provide notice of this defense and he therefore waived it.

The Court of Chancery allowed Jackson to pursue this defense because he "raised an unclean hands defense in his answer, and unclean hands can be a vehicle for asserting a defense based on breach of fiduciary duty or fraud."[146] The court then went on to explain that:

> The fact that Jackson had not formally spelled out a defense based on breach of fiduciary duty thus did not prevent him from arguing that Nielsen and Britton's breach of duty rendered the [Covenants] unenforceable such that Sunder was not entitled to a preliminary injunction. Jackson had identified unclean hands as a defense in his answer, and he diligently pursued that defense by seeking discovery and moving to compel the production of documents related to that defense. Jackson fairly presented the defense for purposes of the injunction application.[147]

---

[145] Appellant's Opening Br. at 29.

[146] *Sunder Energy, LLC v. Jackson*, 2023 WL 8868407, at *6 (Del. Ch. Dec. 22, 2023) (Memorandum Opinion Certifying Interlocutory Appeal).

[147] *Id*.

Appellant argues that the record does not support the conclusion that Jackson's unclean hands defense properly raised a breach of fiduciary duty defense to the breach of contract claim.[148] Appellant contends that fiduciary duty was too attenuated from unclean hands and that "Sunder was not and could not have been on notice of Jackson's fiduciary duty defense based on the vague unclean hands defense" or Jackson's positions during discovery.[149]

Jackson responds that "to the extent [he] was required to raise an affirmative defense to present an argument regarding the lack of enforceability of the LLC Agreement based on Nielsen and Britton's fraud and fiduciary breaches, [he] did so."[150] Specifically, Jackson argues that by raising the "unclean hands" defense in his Answer, he satisfied Court of Chancery Rule 8 and put Sunder on notice.[151] Further, Jackson argues that he "diligently pursued" the fiduciary duty defense in a detailed motion to compel, an amended pleading, and briefing.[152]

We review for abuse of discretion the Court of Chancery's decision to permit amendment to the pleadings or to consider an affirmative defense.[153] Appellant

---

[148] Appellant's Opening Br. at 32.

[149] *Id.* at 33.

[150] Jackson's Answering Br. at 37. Appellees the Freedom Defendants join Jackson in his response to this appellate claim. Freedom Defendants' Answering Br. at 3.

[151] *Id.*

[152] *Id.* at 38.

[153] *See Realty Enters., LLC v. Patterson-Woods*, 11 A.3d 228, 2010 WL 5093906, at *4 (Del. 2010) (TABLE); *Abdi*, 2008 WL 787564, at *2; *H & H Poultry*, 408 A.2d at 291.

blends its discussion of notice and waiver in its briefing. We see these as two separate issues—neither of which supports reversal—and address them as such.

The record shows that Appellant had adequate notice of this defense and an opportunity to respond to it. Jackson pleaded unclean hands as an affirmative defense in his Answer.[154] Further, he pursued a fiduciary duty defense in a Motion to Compel filed October 30, 2023,[155] a Motion for Leave to File a Third Party Complaint filed November 13, 2023,[156] and briefing filed November 14, 2023.[157] As the Court of Chancery correctly pointed out, "[i]n expedited litigation, parties often raise arguments during injunction briefing that have not been fully spelled out in the pleadings."[158]

For similar reasons, we can discern no waiver through Jackson's conduct in the litigation. Waiver is a discretionary tool used by the court to prevent unfair surprise.[159] Appellant was aware of the unclean hands affirmative defense and had the opportunity to respond to Jackson's fiduciary duty arguments in its reply brief in

---

[154] App. to Appellant's Opening Br. at A566; Del. Ct. Ch. R. 8(c).

[155] Court of Chancery Docket I.D. No. 71235337 (Motion to Compel).

[156] App. to Appellant's Opening Br. at A2088.

[157] *Id.* at A2098.

[158] *Sunder Energy*, 2023 WL 8868407, at *5.

[159] *See, e.g., Ratcliffe v. Fletcher*, 690 A.2d 466, 1996 WL 773003, at *2 (Del. 1996) (TABLE) (citing *Mullen v. Alarmguard of Delmarva, Inc.*, 625 A.2d 258, 262–63 (Del. 1993)) ("We noted that leave to amend under Superior Court Civil Rule 15 is granted liberally and that a ruling permitting amendment of a pleading is a highly discretionary one.").

the injunction proceedings.[160]  Under those circumstances, we struggle to identify any unfair surprise or prejudice that Appellant suffered.  The cases that Appellant cites in support of its argument[161] all address un-pleaded affirmative defenses raised at the pre-trial stage and not a preliminary injunction stage.[162]

Additionally, Appellant's argument presumes that Jackson was required to plead an affirmative defense to challenge the enforceability of the LLC Agreement based on Nielsen and Britton's conduct.[163]  But Appellant had the burden of establishing an enforceable contract as an element of its claim in order to obtain a preliminary injunction.[164]  The Court of Chancery therefore did not abuse its discretion in considering the merits of Jackson's defense.

---

[160] App. to Appellant's Opening Br. at A2183–86.

[161] Appellant's Opening Br. at 31.

[162] *See Alexander v. Cahill*, 829 A.2d 117, 128 (Del. 2003) ("While this defense may also have merit, the defense *never gave notice before trial* that it would raise the defense at trial.") (emphasis added); *Realty Enterprises*, 2010 WL 5093906, at *4 ("[Realty] did not raise any claims against the Bariglio brothers in the *pretrial* stipulation.") (emphasis added); *Kaufman v. DNARx LLC.*, 2023 WL 9060288, at *4 (Del. Ch. Dec. 29, 2023) (finding defense waived when defendant *failed to plead* the defense) (emphasis added).

[163] *See* Appellant's Opening Br. at 29.

[164] *See Sunder Energy*, 305 A.3d at 746 ("Sunder's claim for breach of the Covenants is a claim for breach of contract. The elements of a claim for breach of contract are '(i) a contractual obligation, (ii) a breach of that obligation by the defendant, and (iii) a causally related injury that warrants a remedy, such as damages or in an appropriate case, specific performance.'"); *see also Braga Inv. & Advisory, LLC v. Yenni Income Opportunities Fund I, L.P.*,, 2020 WL 3042236, at *8 (Del. Ch. June 2020) ("To establish a claim for breach of contract under Delaware law, a plaintiff must prove: (i) the existence of a valid and enforceable contract . . . .").

## 2. The Court of Chancery's ruling that the entire operating agreement was unenforceable as a matter of law exceeded the scope of the preliminary injunction motion.

Sunder also argues that, even if the Court of Chancery properly considered Jackson's fiduciary duty defense, the court exceeded its authority in a preliminary injunction proceeding by ruling that Nielsen and Britton breached their fiduciary duties as a matter of law.  In this portion of its opinion, the court held that:

> The record demonstrates that the Minority Members had no idea what Nielsen and Britton had accomplished. When questioned about their rights under the 2021 LLC Agreement and then confronted with its actual terms, the Minority Members consistently evidenced shock and surprise about what the agreement said. And that testimony came from Minority Members aligned with Nielsen and Britton.

> Even at this preliminary stage, it is clear *as a matter of law* that Nielsen and Britton breached their fiduciary duty of disclosure in connection with the 2019 LLC Agreement and 2021 LLC Agreement. Nielsen and Britton therefore cannot enforce the terms of the 2021 LLC Agreement against Jackson.[165]

The court later wrote "[t]hat does not mean that Sunder is destined to lose at trial[,]" but "Sunder cannot enforce the Covenants as a matter of law . . . [or] rely on those provisions to secure a remedy from Jackson."[166]

---

[165] *Sunder Energy*, 305 A.3d at 751 (emphasis added).

[166] *Id.* at 762.

Appellant argues that this holding exceeded the issues raised by the parties in the preliminary injunction proceeding. This Court has described the issues raised by a motion for a preliminary injunction as follows:

> When seeking a preliminary injunction, a plaintiff must demonstrate a reasonable probability of success on the merits and that some irreparable harm will occur in the absence of the injunction. Furthermore, in evaluating the need for a preliminary injunction, the Court must balance the [moving party's] need for protection against any harm that can reasonably be expected to befall the [non-moving party] if the injunction is granted.[167]

More succinctly, the standard requires proof of three elements: "(i) a reasonable probability of success on the merits; (ii) irreparable harm absent interim relief; and (iii) that the balance of the equities favors the relief requested."[168] Those were the questions before the trial court in this case.

Motions for preliminary relief often require a trial court to consider legal issues. But the court generally is resolving those issues under the "reasonable probability of success" standard. That was the case here, and the record amply supported the trial court's conclusion that Sunder could not demonstrate a reasonable probability of success on the merits because the circumstances surrounding the LLC Agreements' adoption raised serious questions as to whether the Covenants were

---

[167] *Mills Acquisition Co. v. Macmillan, Inc.*, 559 A.2d 1261, 1278 (Del. 1989) (citing *Gimbel v. Signal Companies, Inc.*, 316 A.2d 599, 603 (Del. Ch. 1974), *aff'd*, 316 A.2d 619 (Del. 1974); *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*, 506 A.2d 173, 179 (Del. 1986)).

[168] *In re New Maurice J. Moyer Acad., Inc.*, 108 A.3d 294, 311 (Del. Ch. 2015) (citing *Revlon*, 506 A.2d at 179).

enforceable. The court ruled that "[w]hen Nielsen and Britton solicited the Minority Members' approval for the 2019 LLC Agreement, they owed a fiduciary duty to disclose fully and fairly all material information, as well as a duty not to make misleading partial disclosures."[169] The court described the 2019 LLC Agreement as "an astoundingly one-sided document, stacked with provisions drafted in Nielsen and Britton's favor."[170] The document contained eighteen changes to the parties' original understanding[171] all of which "should have been called out for the Minority

---

[169] *Sunder Energy*, 305 A.3d at 750.

[170] *Id.*

[171] The Vice Chancellor highlighted the following changes to the 2019 LLC Agreement: "[(1)]Eliminated all fiduciary duties, turning Sunder into a purely contractarian entity; [(2)] Created a manager-managed entity in which Sunder was managed by a Board of Managers consisting only of Nielsen and Britton or their appointees; [(3)] Authorized the Board of Managers to approve compensation agreements with selected members "in its sole discretion"; [(4)] Created two classes of member units–Common Units for Nielsen and Britton and Incentive Units for the other Co-Founders; [(5)] Eliminated voting rights for the Incentive Units, ensuring that Nielsen and Britton exercised 100% of the voting power; [(6)] Ensured that the Incentive Units have no consent rights; [(7)] Reiterated yet again that the Incentive Units have no voting or consent rights; [(8)] Turned each Minority Member's grant of 8,000 Incentive Units into a combination of 1,600 vested units, with another 1,600 units to vest on each anniversary after that; [(9)] Provided for the automatic forfeiture of any unvested Incentive Units if any holder left Sunder; [(10)] Gave Sunder a call option on the Incentive Units for zero dollars per unit if any holder left Sunder without 'Good Reason' or was terminated for cause; [(11)] Eliminated informational rights for holders of Incentive Units; [(12)] Imposed transfer restrictions on the Incentive Units so that they could not be transferred to any third party without Sunder's consent and any transfer would be subject to a right of first refusal in favor of Nielsen and Britton—but not any other Co-Founder; [(13)] Authorized Nielsen and Britton to drag all of the holders of Incentive Units into a third-party transaction; [(14)] Granted pre-emptive rights to Nielsen and Britton, but not any other Co-Founder; [(15)] Provided Nielsen and Britton—but not any other Co-Founder—with broad indemnification and advancement rights; [(16)] Recited that all of the signatories made various representations in connection with entering into the 2019 LLC Agreement; [(17)] Recited that each party had the opportunity to review the 2019 LLC Agreement with independent legal counsel and that Snell & Wilmer only represented Sunder in connection with the preparation of the document; [and] [(18)] [m]ost significantly for this case, Article XIII of the 2019 LLC Agreement added the

41

Members."[172] The court therefore concluded that Sunder had not met the first prong of the preliminary injunction standard.

The inquiry, however, did not need to go further, and to the extent that the trial court's opinion can be read as determining as a matter of law that the operating agreement was unenforceable with respect to all signatories, the court strayed beyond the legal and factual questions presented at the preliminary injunction stage of the proceeding. If we were to affirm that holding in the sweeping way that it could be read, it would result in unfair surprise and potential unintended consequences for all signatories, including those who were not parties to the litigation, as well as possible consequences for Sunder's creditors and business partners.

A motion for a preliminary injunction is presented on a limited discovery record, with a truncated schedule, and in an abbreviated proceeding before the trial court. The standard therefore requires the court to weigh probabilities and equities, rather than make final conclusions regarding the merits of the parties' legal positions. Accordingly, upon remand, whether the operating agreement is enforceable against Jackson remains an open question. If the parties engage in

---

Covenants. Article XIII also imposed a contractual confidentiality obligation on the holders of Incentive Units—and only the holders of Incentive Units." *Id.* at 734–35.

[172] *Id.* at 750.

further proceedings before the trial court, it may become necessary for the Court of Chancery to make a final determination regarding enforceability as a matter of law, but the parties will be able to present a complete record to the court before asking it to make that ruling.

## C. The Court of Chancery correctly held that Utah law applied to Appellant's tortious interference claim.

Finally, Appellant argues that the Court of Chancery erred in ruling that Utah law governs Appellant's tortious interference claim against the Freedom Defendants, which had the effect of dismissing that claim.[173]  Both parties agree that Delaware courts use the principles from the Restatement (Second) of Conflicts of Law and apply the laws of the jurisdiction with the most significant relationship to the dispute.[174]  Appellant does not take issue with the court's application of any of those principles but instead argues that, although "[t]he facts of this case implicate many states' interests[,] . . . [t]he only common ground these parties share . . . is Delaware, where they all do business and deliberately chose to organize their LLCs."[175]  Rather than challenge the court's analysis under the Restatement, Appellant argues that the Restatement is "flexible" and "Delaware law has the most significant interest in this

---

[173] Appellant's Opening Br. at 40.

[174] *Id.*; Freedom Defendants' Answering Br. at 35.

[175] Appellant's Opening Br. at 41.

43

claim and should thus govern its adjudication."[176]  Appellees argue that the court

"correctly applied the routine choice-of-law analysis employed by Delaware courts

to determine which law should apply to specific legal claims."[177]

The Court of Chancery identified and thoroughly analyzed the Restatement

factors to determine which jurisdiction has the most significant relationship to this

controversy.[178]  For a tortious interference claim, a court considers four factors:

> 1) the place where the injury occurred; 2) the place where the conduct
> causing the injury occurred; 3) the domicile, residence, nationality,
> place of incorporation and place of business of the parties; and 4) the
> place where the relationship, if any, between the parties is centered.[179]

For the first factor, the Court of Chancery reasoned that "[w]hen an injury consists

of the loss of customers or business, '[t]he effect of the loss, which is pecuniary in

its nature, will normally be felt most severely at the plaintiff's headquarters or

principal place of business.'"[180]  The court went on to find that Sunder is

headquartered in Utah, its injury therefore occurred in that state, and accordingly the

first Restatement factor favored applying Utah law.[181]  Appellant does not address

this finding on appeal.

---

[176] *Id.* at 42.

[177] Freedom Defendants' Answering Br. at 35.

[178] *Sunder Energy*, 305 A.3d at 760 (citing Restatement (Second) of Conflict of Laws § 145(1) (1971)).

[179] *Id.*

[180] *Id.* (citing and quoting Restatement (Second) of Conflict of Laws § 145(1) cmt. f. (1971)).

[181] *Id.* at 760.

44

The court found that the second factor was "immaterial" in this case because the conduct did not take place in either Utah or Delaware.[182]

As to the third factor, the court considered Appellant's argument that "the court should apply Delaware law when determining whether two Delaware LLCs and their executives tortiously interfered with the LLC agreement of another Delaware LLC," but concluded that "the Restatement says otherwise."[183] The court therefore held that "[b]ecause Sunder's principal place of business is in Utah, this factor favors the application of Utah law."[184]

Finally, regarding the fourth factor, neither party contended that their relationship was centered in Delaware. The court stated that:

> [t]o the extent the relationship between Sunder and Jackson is what matters (on the theory that that relationship was the subject of the tortious interference), then the relevant jurisdictions are Utah and Texas. To the extent the relationship between Sunder and Freedom is what matters, the relevant jurisdictions are Utah and California. To the extent the relationship between Sunder and Solar Pros is what matters, the relevant jurisdictions are Utah and Nevada. As between Utah and Delaware, this factor favors Utah.[185]

Once again, Appellant does not specifically challenge this finding on appeal.

---

[182] *Id.* at 761.

[183] *Id.*

[184] *Id.*

[185] *Id.*

The Court of Chancery applied the correct significant-relationship test to the choice-of-law question, and we can discern no error in the court's application of the facts to that test. We therefore affirm the court's conclusion that Utah law applied to Appellant's tortious interference claim.

## IV. CONCLUSION

For the foregoing reasons, we affirm the Court of Chancery's decision denying Sunder's preliminary injunction motion. We reverse only the portion of the court's ruling that determined as a matter of law that the LLC Agreement was not enforceable.